# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| **ANNE BENNETT MORRISON** \* **DIETZ** | **CIVIL ACTION NO. 07-1398** |
| **VERSUS** \* | **MAGISTRATE JUDGE HILL** |
| **JOHN FORD DIETZ** \* | **BY CONSENT OF THE PARTIES** |

## REASONS FOR JUDGMENT

On June 3-4, 2008, the Court conducted a bench trial of this matter. [rec. doc. 82].[1] Appearing at the trial were Charles Glasscock Fitzgerald, representing plaintiff, Anne Bennet Morrison Dietz, and John Ford Dietz, proceeding *pro se*. The parties were given until the close of business on June 16, 2008 to file post-trial briefs. Both parties filed briefs on June 16, 2008. [rec. doc. 88, 89]. Plaintiff filed a revised post-trial rebuttal and a revised brief on June 20 and 21, 2008, respectively. [rec. docs. 90, 91]. Defendant filed a post-trial rebuttal brief on June 20, 2008. [rec. doc. 92]. Thereafter, the Court took the matter under advisement.

### *Findings of Fact and Conclusions of Law*

The Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a):

---

[1]The parties consented to the jurisdiction of the court being exercised by the undersigned.

Plaintiff, Anne Bennet Morrison Dietz ("Anne Dietz"), and defendant, John Ford Dietz ("John Dietz"), both of whom are natural-born citizens of the United States, were married in Santa Fe, New Mexico on December 15, 1990. After living in the United States for several years, they moved, at the suggestion of John Dietz, to San Miguel de Allende, Guanajuato, Mexico. Two children were born of the marriage: A.M.D., born on December 14, 1994 (now age 13), and A.J.M.D., born on June 23, 1998 (now age 10). The couple was divorced by Judgment dated September 10, 2001, by the Minor Court in San Miguel De Allende, Mexico (the "Mexican Court").

In that Judgment, Anne Dietz was granted custody of both children. [Plaintiff's Trial Exhibit 1]. Specifically, the Judgment provides that: "The children of the marriage . . . both with the last name MORRISON DIETZ, shall be under the care and custody of the mother, Ms. ANNE BENNETT DIETZ, at the domicile marked with number 24 of Calle Santo Domingo of this city [San Miguel de Allende], with the possibility of changing domicile, and obliging herself to give notice to John Ford Dietz of any change." [Plaintiff's Trial Exhibit 1, p. 3]. Her ex-husband, John Dietz, was granted visitation rights as follows: "The parties stipulate that Mr. JOHN FORD DIETZ shall have visiting rights over his children on the day he decides to be with them, including taking them on vacation, with

previous notice of this to the mother, Ms. ANNE BENNETT MORRISON."
[Plaintiff's Trial Exhibit 1, p. 3].

After the divorce, the children resided with Anne Dietz and John Dietz in Mexico.  In January, 2006, John Dietz took A.M.D. from Mexico to Gueydan, Louisiana. Anne Dietz had given permission for John Dietz to take A.M.D. on a vacation to the United States. [Tr. 252, lines 6-7].  However, she did not consent to A.M.D.'s permanent relocation to the United States. [Tr. 254, lines 10-14].

John Dietz filed suit for full custody of the minor children in the Mexican Court in March 2006. [Tr. 31, lines 21-25; 32, lines 1-8].  On May 21, 2006, John Dietz returned to Mexico and took A.J.M.D. back with him to the United States. [Tr. 34, lines 11-15].  After Anne Dietz called the school and spoke with his teachers, she discovered that A.J.M.D. had been permanently removed.  [Tr. 34, lines 17-22; 35, lines 13-17].  This occurred one or two weeks before the school term had ended.  [Tr. 36, lines 7-11].

Anne Dietz then called the home of John Dietz's parents, who live in Gueydan, Louisiana, to find out the location of John Dietz. [Tr. 34, lines 22-23]. She spoke to John Dietz's brother, Thomas, who stated that they might be at Six Flags, but he did not really know where they were. [Tr. 34, lines 24-25; 38, lines 4-9].  Anne Dietz continued calling John Dietz's parents to ascertain the location

of the children, because John Dietz was not answering his cell phone. [Tr. 37, lines 18-24]. However, once John Dietz's parents finally answered one of her phone calls, John Dietz's mother told Anne Dietz that "John does not want us to talk to you." [rec. doc. 37, line 25; 38, lines 2-3].

Anne Dietz further testified that she had called Louisiana first, because John Dietz's parents lived there. [Tr. 41, lines 13-15]. However, because John Dietz performed legal work on Indian reservations in the southwestern United States, she also thought that he could have taken the children to New Mexico, Colorado, or Arizona. [Tr. 41, lines 13-16]. John Dietz was licensed to practice law in Colorado and New Mexico, but not Louisiana. [Tr. 301, lines 1-7]. He also owns an interest in 42 acres of property in Colorado. [Tr. 98, lines 21-23]. Anne Dietz stated that she did not know that the children were back in Louisiana until August of 2006. [Tr. 41, lines 19-21]. There is no credible evidence to the contrary.

On June 21, 2006, Anne Dietz obtained an order from the Mexican Court commanding John Dietz to return A.J.M.D. to her custody. [Plaintiff's Trial Exhibit 2]. John Dietz failed to appear for a hearing on June 23, 2006, citing "delicate health." [Plaintiff's Trial Exhibit 4]. Anne Dietz testified that shortly after John Dietz took A.J.M.D. in May, 2006, her attorney told her that John was not going to return to court in Mexico. [Tr. 50, lines 2-19].

On July 28, 2006, the Mexican Court issued a criminal arrest warrant for John Dietz for Nonfulfillment of Family Assistance Obligations and Arbitrary Exercise of His Own Right against Anne Dietz and A.J.M.D. [Plaintiff's Trial Exhibit 3; Tr. 46, lines 2-4]. John Dietz's custody action was dismissed by the Mexican Court on January 10, 2007 because he presented conflicting medical excuses to support his failure to appear at the June 23, 2006 hearing. [Plaintiff's Trial Exhibit 4; Tr. 47, lines 16-23].

On May 24, 2007, Anne Dietz filed an application for return of the children under the Hague Convention on the Civil Aspects of International Child Abduction. [Tr. 54, lines 20-24; Plaintiff's Trial Exhibit 5]. The Mexican Central Authority directed an Application for the Return of the Children to the United States Central Authority on May 24, 2007. [Plaintiff's Trial Exhibit 5].

On July 13, 2007, plaintiff filed a Petition for Return of Children in the 15th Judicial District Court for the Parish of Vermilion, State of Louisiana, under Docket No. 87187. [rec. doc. 1, Exhibit 1]. This action was filed pursuant to the Convention on the Civil Aspects of International Child Abduction done at the Hague on 25 October 1980 (the "Hague Convention"), as codified in the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601, *et*

*seq*. At the time of the application, John Dietz was living in Gueydan, Louisiana with the children.

On August 24, 2007, John Dietz removed the case to this Court. [rec. doc. 1]. He asserts that the children are "well settled" in their current location, and that the Court is not obligated to order their return. He further contends that plaintiff consented to their removal. Additionally, he alleges that there is a "grave risk" that the children would suffer severe psychological and/or physical harm if they were returned to plaintiff.

The Court held set a hearing on August 27, 2007, to set an expedited discovery schedule, trial date and, possibly, to determine the temporary custody of the children pending trial. [rec. doc. 3]. However, Anne Dietz failed to appear for the hearing because she had taken the children to Mexico in violation of this Court's order. [rec. docs. 11, 17]. The Court issued a bench warrant, and the case was administratively closed pending her return. [rec. docs. 12]. On December 18, 2007, Anne Dietz was taken into custody and returned to the United States; these proceedings were reopened. [Tr. 238, line 25; 239, lines 7-8].

A bench trial on the Hague Convention application was held in this Court on June 3-4, 2008.

## *Hague Convention and ICARA*

The Hague Convention is an international treaty, to which the United States and Mexico are signatories. *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 376 (8th Cir. 1995). "The Convention is designed to secure the prompt return of children who have been abducted from their country of habitual residence or wrongfully retained outside that country." *Ibarra v. Quintanilla Garcia,* 476 F.Supp.2d 630, 632-633 (S.D. Tex. 2007) (*citing* Oct. 30, 1985, transmittal letter from President Ronald Reagan to the United States Senate, *reprinted at* 51 Fed.Reg. 10,495 (March 26, 1986)).

The Hague Convention operates to restore the *status quo* as it existed before the wrongful removal of a child by establishing procedures for the return to the child's country of "habitual residence" before the removal. (Hague Convention, arts. 3, 12, *reprinted at* 51 Fed.Reg. 10498-99); H.R. DOC. NO. 100-525, at 5 (1988) ("[t]he Convention is designed promptly to restore the factual situation that existed prior to a child's removal or retention."); *Sealed Appellant v. Sealed Appellant,* 394 F.3d 338, 344 (5th Cir. 2004); *England v. England,* 234 F.3d 268, 271 (5th Cir. 2000); *Ibarra*, 476 F.Supp.2d at 633. The Explanatory Report to the Convention instructs:

> [F]rom the Convention's standpoint, the removal of a child by one [parent with custody] without the consent of the other, is . . . wrongful, and this wrongfulness derives . . . from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. . . . [The Convention] is not concerned with establishing the person to whom custody of the child will belong at some point in the future. . . . It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.

Explanatory Report, ¶ 71, at 447-48.

Another of the Convention's aims is to deter parents from crossing borders in search of a more sympathetic court. *England,* 234 F.3d at 271 (*citing Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6ᵗʰ Cir. 1996) (*Friedrich II*)). Accordingly, the Convention prohibits courts considering Convention petitions from "adjudicating the merits of [the] underlying custody dispute[s]." *Id*. (citations omitted).

In 1988, the United States ratified the Convention and enacted the International Child Abduction and Remedies Act ("ICARA"), the implementing legislation. *Sealed Appellant,* 394 F.3d at 342. Pursuant to ICARA, state and federal district courts have concurrent original jurisdiction of actions arising under the Convention. 42 U.S.C. § 11603(a). A person seeking a child's return under the Convention may commence a civil action by filing a petition in a court in the jurisdiction where the child is physically located. *Id*. § 11603(b). The petitioner

bears the burden of showing, by a preponderance of the evidence, that the removal or retention was wrongful, *id*. § 11603(e)(1)(A); the respondent, has the burden of proving any affirmative defenses, *id*. § 11603(e)(2). *Sealed Appellant*, 394 F.3d at 342.

<u>*WRONGFUL REMOVAL*</u>

Under the Convention, courts in contracting countries must return a wrongfully-removed child to his country of habitual residence. *Id.* at 343 (*citing* Convention, art. 12; 42 U.S.C. § 11601(a)(4)). For purposes of the Convention, it is irrelevant whether there is a custody dispute concerning that child pending at the time of removal. *Id*.; Hague Convention, art. 4 ("The Convention shall apply to any child who was habitually resident in a Contracting State immediately before any breach of custody rights . . . .").

Initially, a petitioner bears the burden to prove, by a preponderance of the evidence, that the child's removal was wrongful within the meaning of the Hague Convention. *Van Driessche v. Ohio-Esezeoboh,* 466 F.Supp.2d 828, 841 (S.D. Tex. 2006); *Bader v. Kramer*, 445 F.3d 346, 349 (4th Cir. 2006) (*citing* 42 U.S.C. § 11603(e)(1)). A parent wrongfully removes a child when he or she removes or retains the child outside the child's country of habitual residence, and this removal breaches the rights of custody accorded to the other parent under the laws of that

country; and, at the time of removal, the non-removing parent was exercising those custody rights. *Sealed Appellant*, 394 F.3d at 343; Convention, art. 3.

## *Habitual Residence*

The Hague Convention is in place to facilitate the return of internationally abducted children to their countries of "habitual residence" for custody determination. S. REP. NO. 107-218, at 132 (2002).  A child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a "degree of settled purpose" from the child's perspective. *Van Driessche*  466 F.Supp.2d at 842.  However, when a child is too young to have an intent regarding habitual residence, the inquiry becomes "shared parental intent." *Id.* (*citing In re Application of Adan*, 437 F.3d 381, 392 (3d Cir.2006).  The Court must consider all available evidence to determine the shared parental intent at the time of removal.  *Id.* (*citing Mozes v. Mozes*, 239 F.3d 1067, 1076 (9th Cir. 2001)).

The unique circumstances of each case must be considered when inquiring into a child's habitual residence.  *Id.* (*citing Holder v. Holder*, 392 F.3d 1009, 1016 (9th Cir. 2004)).  To establish a habitual residence, there must be a settled intention to abandon the residence left behind and an actual change in geography

for a period of time that is sufficient for acclimatization. *Id*.; *Mozes*, 239 F.3d at 1078.

A person can have only one habitual residence. *Friedrich v. Friedrich,* 983 F.2d 1396, 1401 (6th Cir.1993) ("*Friedrich I*").  On its face, habitual residence pertains to customary residence prior to the removal.  *Id*.  The court must look back in time, not forward.  *Id*.

The record shows that John Dietz and Anne Dietz established their domicile in Mexico with their children in 1999, where they all remained through the time of the divorce in September, 2001.  [Tr. 15, lines 12-14; 16, lines 22-25; 18, lines 13-21].  For the remainder of 2001 through January of 2006, the children's primary residence was in Mexico. [Tr. 20, lines 23-25; 21, lines 1-14; 23, lines 17-20; 256, lines 14-25; 257, lines 1-17].  After the divorce, John Dietz continued to work at his office, which was connected to the residence where Anne Dietz was living with the children.  [Tr. 25, lines 13-25; 26, lines 1-6]. After John Dietz remarried, he continued to live in Mexico.

In January, 2006, John Dietz took A.M.D. from Mexico to the United States. [Tr. 23, lines 5-13].  John Dietz  had informed Anne Dietz that he was taking A.M.D. with him, and she consented.  [Tr. 31, lines 1-5].  However, Anne Dietz was not aware at the time that John Dietz was not going to return A.M.D. to Mexico. [Tr. 30, lines 21-24].  While Anne Dietz gave John Dietz her permission

to take A.M.D. on vacation, she did not give him permission to permanently relocate A.M.D. to the United States.  [Tr. 31, lines 15-20; 58, line 25; 59, lines1-2].

John Dietz testified that A.M.D.'s removal was intended to be temporary, but that "[w]ithin a couple of weeks or so before the end of January 2006, I realized that it was very likely [A.M.D.] would not be able to come back [to Mexico] based upon developments."  [Tr. 286, lines 9-16].

Before the end of the school year, John Dietz took A.J.M.D. from Mexico to the United States in May of 2006. [Tr. 23, lines 21-25].  Anne Dietz testified that she did not consent to A.J.M.D.'s removal to the United States.  [Tr. 58, lines 22-24].  John Dietz admitted that Anne Dietz in no way consented to A.J.M.D.'s removal.  [Tr. 285, lines 3-5].

It is undisputed that both boys had been living in Mexico for several years prior John Dietz's taking them to the United States in 2006; the custody of the children had been adjudicated by the Mexican Court (which recognized that the domicile of the children was in Mexico) with the consent of both parties. Accordingly, the Court finds that the children's habitual residence at the time of their removal was in Mexico.

*Breach of Custody Rights*

In addition to proving that Mexico was the children's habitual residence, Anne Dietz had the burden to prove that the removal of the children was in breach of her custody rights under Mexican law. *Van Driessche,* 466 F.Supp.2d at 843; *Bader*, 445 F.3d at 349.

In the Mexican divorce decree dated September 10, 2001, the parties agreed to be bound by six clauses, two of which are relevant to this action. The first clause provides that the children of the marriage "shall be under the care and custody of the mother." [Plaintiff's Trial Exhibit 1, p. 3]. That clause further provides that the domicile is "number 24 of Calle Santo Domingo of [San Miguel de Allende], with the possibility of changing domicile, and obliging [Anne Dietz] to give notice to John Ford Dietz of any change." In the Second clause, the parties stipulated that "Mr. John Ford Dietz shall have visiting rights over his children on the day he decides to be with them, including taking them on vacation, with previous notice of this to the mother."

Under the September 10, 2001 divorce decree, Anne Dietz was awarded custody of both children at their domicile in Mexico. [Tr. 23, lines 9-20]. Although John Dietz later brought an action in Mexico to change custody, he failed to pursue the change of custody, and, therefore, the custody order of the Mexican Court remains in effect. John Dietz then took the children in 2006, which interfered with Anne

Dietz's custody rights. [Tr. 244, lines 9-25; 245, lines 1-6]. Thus, the Court finds

that Anne Dietz has custody of the children under the Mexican divorce decree and

that John Dietz breached her custody rights by removing the children and relocating

them to the United States without her consent.

### *Exercising Custody*

The Hague Convention defines 'rights of custody' as including "rights relating

to the care of the person of the child and, in particular, the right to determine the

child's place of residence." Convention, art. 5. If a court determines that a child has

been wrongfully removed, the court shall order the return of the child, unless the

person who opposes the return establishes that the party seeking return was not

actually exercising the custody rights at the time of removal. Convention, arts. 12,

13a. Under the enacting legislation, ICARA, the party opposing the return has a

burden of proving, by a preponderance of the evidence, that the other party was not

actually exercising custody rights. 42 U.S.C. § 11603(e)(2)(B); *Hague Convention*

art. 13a.

The determination whether a party is exercising custody rights closely parallels

the determination of the nature and dimension of those rights. *Sealed Appellant*, 394

F.3d at 344. Courts charged with deciding "exercise" under the Convention must not

cross the line into a consideration of the underlying custody dispute. *Id*. To avoid

14

this possibility, American courts have interpreted "exercise" broadly. *Id*. (*citing Friedrich II*, 78 F.3d at 1063). *Friedrich II* held: "The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child" *Id*. at 1065.

> [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention *short of acts that constitute clear and unequivocal abandonment of the child*. Once it determines that the parent exercised custody rights in any manner, the court should stop – completely avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of federal courts.

*Id*. at 1066 (footnote and citation omitted; emphasis added).

In *Friedrich II*, the court noted that "[a]lthough there may be situations when a long period of unexplainable neglect of the child could constitute non-exercise of otherwise valid custody rights under the Convention, as a general rule, any attempt to maintain a somewhat regular relationship with the child should constitute 'exercise'." *Id*.

The Fifth Circuit adopted *Friedrich II's* reasoning in *Sealed Appellant*, 394 F.3d at 345 (". . . we adopt this reasoning from *Friedrich II.*"). Accordingly, in the

absence of a ruling from a court in the child's country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes "exercise" of those rights. *Id.* at 344; *see also* H.R. NO. 100-525, at 6 (1988) ("The Court is required to return a child to his/her habitual residence even if there is no legal order establishing custody.").

To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child. *Id.* at 345. In *Friedrich II*, the court held that by visiting his children at least five times a year and contributing to their financial support, the father of two children was exercising his custody rights when the mother removed the children.

Here, the children, apparently, spent much of the time, beginning at some point after John Dietz remarried, with their father and step-mother on a ranch located outside of the town where Anne Dietz lived.

John Dietz took A.M.D. from Mexico in January, 2006, and took A.J.M.D. from Mexico in May, 2006. At trial, John Dietz admitted that Anne Dietz had visitation and contact with A.J.M.D. and A.M.D. in 2005, prior to their removal from Mexico. [Tr. 268, lines 13-15; 270, lines 1-7]. Additionally, John Dietz testified that Anne Dietz had telephone contact with A.J.M.D. and A.M.D. in 2005. [Tr. 266, lines 4-8; 268,

lines 17-19; 269, lines 7-13; 270, lines 5-7]. Further, Anne Dietz specifically testified that she did not abandon her children. [Tr. 24, lines 14-16].

Anne Dietz testified that after the divorce, John Dietz kept an office on the property where she was living with the children. [Tr. 25, lines 13-25; 26, lines 1-6]. At the time, Anne Dietz was working at John Dietz's office. [Tr. 27, lines 10-15]. Anne Dietz testified that A.M.D. was attending internet school on a computer in his father's office, and that she saw the children every day during the week, whenever they came there. [Tr. 24, lines 20-25; 27, lines 12-15; 30, lines 15-17].

Additionally, Anne Dietz testified that the children would go back and forth between spending time with their father at his ranch outside of town and with her at the family residence. [Tr. 26, lines 14-18]. She also said that she saw A.M.D. almost every day in 2005 when he was not traveling with his father. [Tr. 26, lines 19-22]. As to A.J.M.D., she reported that he would spend the night with her for a week, then spend a week or two at the ranch with his father. [Tr. 27, lines 1-9]. Further, she visited with A.J.M.D. regularly between January, 2006 and May 21, 2006, which was the date of his removal to the United States. [Tr. 269, lines 7-13].

After John Dietz removed A.M.D. from Mexico, Anne Dietz spoke with her son by telephone on several occasions. [Tr. 55, lines 16-20]. A few times, however, John Dietz told his family not to allow her to speak to A.M.D. [Tr. 55, lines 21-23]. John

Dietz admitted, however, that Anne had "frequently" called his parents' home during that summer to speak with the boys. [Tr. 298, lines 24-25; 299, lines 1-3]. His parents, Delores Hair Dietz and Albert Louis Dietz, Jr., confirmed that Anne Dietz called the children often. [Tr. 365, lines 5-9; 401, lines 4-7; 415, lines 1-4].

During the trial, John Dietz attempted to show that Anne Dietz had insufficient means to provide for the children. [Tr. 142, lines 21-25; 143, lines 1-25; 144, 1-4; 236, lines 4-22]. However, Anne testified that her brother, Richard Morrison, had been helping her with her finances. [Tr. 204, lines 15-17; 320, line 17]. In any event, lack of financial support over a short period of time is insufficient under the convention to demonstrate that a parent has ceased exercising custody rights. *See Baxter v. Baxter,* 423 F.3d 363, 369-70 (3rd Cir. 2005).[2]

The Court finds that John Dietz failed to prove that Anne Dietz was not exercising her custody rights. Anne Dietz did not clearly and unequivocally abandon her children. *Friedrich II*, 78 F.3d at 1066. In fact, her actions were to the contrary. Accordingly, I find that Anne Dietz has met her burden of establishing, by a preponderance of the evidence, that the children were habitually residing in Mexico, that she had rights of custody, and that she was exercising her custody rights prior to

---

[2]Additionally, the Mexican Court ordered John Dietz to pay child support, which, at some point, he apparently ceased paying.

her sons' removal. Consequently, the children's removal from Mexico was wrongful as defined by the Hague Convention. *Van Driessche,* 466 F.Supp.2d at 845.

## AFFIRMATIVE DEFENSES

Once the petitioner establishes that the respondent wrongfully removed the child from his habitual residence, the child must be returned unless the respondent can establish one of four narrow affirmative defenses. *Sealed Appellant*, 394 F.3d at 342 (*citing* Convention, arts. 12, 13, 20); *Van Driessche,* 466 F.Supp.2d at 841; *Friedrich*, 78 F.3d at 1067 (6th Cir.1996). A child may not be returned to his country of habitual residence if the removing party can show, by a preponderance of the evidence, that: (1) the proceeding was commenced more than one year after the removal of the child, and the child has become settled in his new environment; or, (2) the person seeking return of the child consented to, or acquiesced in, the removal or retention. *Van Driessche*, 466 F.Supp.2d at 841 (*citing* Convention, arts. 12, 13(a); 42 U.S.C. § 11603(e)(2)(B)). A removing party also may prevent the child's return if he can show, by clear and convincing evidence, that: principles relating to the protection of human rights and fundamental freedoms do not permit the return of the child; or, the return would cause grave risk to the child's mental or physical well-being. *Sealed Appellant,* 394 F.3d at 342 (*citing* Convention, arts. 20, 13(b); 42 U.S.C. § 11603(e)(2)(A)).

*Grave Risk*

Under Article 13b of the Hague Convention, a court is not bound to order the return of the child if there is a grave risk that the return of the child would expose the child to physical or psychological harm. *Friedrich*, 983 F.2d at 1400; *see also* 42 U.S.C. § 11603(e)(2)(a); Hague Convention art. 13b. The burden is with the respondent to demonstrate "by clear and convincing evidence" that the exception applies. *Simcox v. Simcox*, 511 F.3d 594, 604 (5th Cir. 2007) (*citing* 42 U.S.C. § 11603(e)(2)(A). Courts have interpreted "grave risk" narrowly. *Id*.

The text of the article requires only that the harm be "physical or psychological," but the context makes it clear that the harm must be a great deal more than minimal. *Walsh v. Walsh*, 221 F.3d 204, 218-219 (1st Cir. 2000); *see also Nunez-Escudero*, 58 F.3d at 377. The risk must be "grave", and, when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention. *Id*. (*citing* Hague Convention, art. 1). For example, the harm must be "something greater than would normally be expected on taking a child away from one parent and passing him to another"; otherwise, the goals of the Convention could be easily circumvented. *Id*. (*citing Re A. (a Minor) (Abduction)* [1988] 1 F.L.R. 365, 372 (Eng.C.A.)); *see also Friedrich*, 78 F.3d at 1067-68; *Re C. (Abduction: Grave Risk of Psychological Harm)* [1999] 1 F.L.R. 1145 (Eng.C.A.); *C. v. C. (Minor: Abduction: Rights of Custody*

*Abroad)* [1989] 1 F.L.R. 403, 410 (Eng.C.A.). Courts are not to engage in a custody determination, so "[i]t is not relevant . . . who is the better parent in the long run, or whether [the absconding parent] had good reason to leave her home . . . and terminate her marriage." *Id.* (*citing Nunez-Escudero*, 58 F.3d at 377); *see also* Department of State, 219 *Hague International Child Abduction Convention: Text and Legal Analysis*, 51 Fed.Reg. 10,494, 10,510 (1986) ("[Article 13(b) ] was not intended to be used by defendants as a vehicle to litigate . . . the child's best interests."); H.R. NO. 100-525, at 5 (1988) ("[the Convention] does not seek to settle disputes about legal custody rights, nor does it depend upon the existence of court orders as a condition for returning children.").

Little law in the Fifth Circuit exists on what constitutes "grave risk." The leading case on this issue is *Friedrich II*, which has, in part, been relied upon by the Fifth Circuit. *See Sealed Appellant*, 394 F.3d 338. In *Friedrich II*, the Sixth Circuit concluded that mere adjustment problems that come with the relocation of most children is not enough to satisfy the requirement of proof of grave risk of harm to a child. *See also Walsh*, *supra*, 221 F.3d 204 (1st Circuit 2000) (argument that removal would unsettle children who have now settled in the United States is insufficient to be grave risk of harm because that is an inevitable consequence of removal.).

In *Friedrich II*, the court held that "grave risk" of harm, for the purposes of the Convention, can exists only in two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute, e.g., returning the child to a zone of war, famine, or disease. 78 F.3d at 1069. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.[3]  *Id*.; *see also Response to International Parental Kidnaping: Hearing Before the Sen. Comm. on Criminal Justice Oversight*, (1999) (statement of Catherine L. Meyer, British Embassy Co-chair of the International Centre for Missing & Exploited Children):

> The Hague Convention provides limited defences based on welfare considerations – a court has the discretion not to return an abducted child if returning it would place the child at "grave risk of psychological or physical harm " or put it in an "intolerable situation ". These are strong terms and they are meant to apply 'in extreme circumstances only. The precedent case of Friedrich v. Friedrich (US Appeals Court - 6th District, 1996) established that "grave risk of psychological or physical harm" could only apply to a situation where a child would be

---

[3]There was no proof offered at trial that the Mexican Court was incapable or unwilling to adequately protect the children. John Dietz made un-corroborated allegations that he would not be treated fairly by the Mexican Court because of the influence of the Mexican counsel for Anne Dietz.

returned to a zone of famine or war or to a situation of serious abuse or neglect.

1999 WL 988418 (F.D.C.H.) (1999).

The facts in the instant case are similar to those in *Friedrich II.* There, the German father petitioned the court for return to his son to Germany after the mother removed him to Ohio. She argued that the return of her son to Germany would cause him grave psychological harm, because he had grown attached to family and friends in Ohio. She also hired an expert psychologist who testified that returning the child to Germany would be traumatic and difficult for the child, who was currently happy and healthy in America with his mother. The court disagreed that this constituted grave risk, finding as follows: "If we are to take the international obligations of American courts with any degree of seriousness, the exception to the Hague Convention for grave harm to the child requires far more evidence than Mrs. Friedrich provides. Mrs. Friedrich alleges nothing more than *adjustment* problems that would attend the relocation of most children." (emphasis in original). *Id*. at 1067.

The Fifth Circuit has adopted the standards and reasoning set forth in *Friedrich II. See England*, *supra* (mother's argument that adoptive child's turbulent history in orphanages, foster care, and difficult adoption proceedings was not enough to establish grave risk of psychological harm if she were separated from her mother).

Other courts have also followed *Friedrich II,* and include: *Nunez-Escudero*, 58 F.3d at 377 ("district court incorrectly factored the possible separation of the child from his mother in assessing whether the return of the child to Mexico constitutes a grave risk that his return would expose him to physical or psychological harm or otherwise place him in an intolerable situation"); *Walsh*, 221 F.3d at 220 n. 14 (1st Cir. 2000) ("We disregard the arguments that grave risk of harm may be established by the mere fact that removal would unsettle the children who have now settled in the United States. That is an inevitable consequence of removal"). Given the rationale for the adoption of the Convention, and the enacting legislation passed by the Congress, the undersigned is compelled to agree with this reasoning. Additionally, the courts of other signatories to the Convention have come to the same conclusion.

It has been said that courts in the United States should give considerable weight to the well-reasoned opinions of other Convention signatories. *Nunez-Escudero*, 58 F.3d at 377; *see also Air France v. Saks,* 470 U.S. 392, 403, 105 S.Ct. 1338, 1344, 84 L.Ed.2d 289 (1985); 42 U.S.C. § 11601(b)(3)(B) (recognizing "the need for uniform international interpretation" of international treaties). The Supreme Court of Canada has concluded that only severe potential harm to the child will trigger the "grave risk"

exception, stating as follows:

> In brief, although the word "grave" modifies "risk" and not "harm," this must be read in conjunction with the clause "or otherwise place the child in an intolerable situation." The use of the word "otherwise" points inescapably to the conclusion that the physical or psychological harm contemplated by the first clause of art. 13(b) is harm to a degree that also amounts to an intolerable situation.

*Thomson v. Thomson*, 119 D.L.R.4th 253, 286 (Can.1994); *see also In re A. (A Minor)*, [1988] 1 F.L.R. 365, 372 (Eng.C.A.) (abducting parent must prove grave risk of harm that is "something greater than would normally be expected on taking a child away from one parent and passing him to another").

At trial, Dr. Ken Bouillion testified as an expert in clinical child psychology. [Tr. 64, lines 12-14]. Dr. Bouillion opined that "there would be great risk of psychological harm to the boys should they return to Mexico and the care of their mother." [Tr.79, lines 23-25]. He based his opinion on the fact that from the fall of 2003, when Anne Dietz went to Belize to live with a friend, she had been inconsistently involved in the care of the children, except for the period of time the previous fall when they lived with her. [Tr. 80, lines 1-4]. He further noted that, throughout the interviews, the boys demonstrated little attachment to their mother. [Tr. 80, lines 5-6].

Dr. Bouillion testified that the boys had also raised issues "somewhat vague of neglect" and lack of parenting by their mother. [Tr.80, lines 7-8]. Dr. Bouillion testified that the boys had referred frequently to being cared for by multiple nannies. [Tr. 80, lines 8-9]. They had also expressed concerns about their mother's past history of alcohol and drug abuse, and having other adults in her home. [Tr. 80, lines 9-11]. However, Dr. Bouillion testified that there was no evidence of physical, sexual or verbal abuse of either child by their mother. [Tr. 104, lines 13-25, p. 105, lines 1-2].

Dr. Bouillion was also struck by the negative emotional trauma that the boys had experienced the previous August when they were removed from their school by their mother without any knowledge or cognitive understanding of that whole process.[4] [Tr. 80, lines 12-16]. He cited the fact of their unwillingness to return to Mexico against their stated desires to remain in the United States. [Tr. 80, lines 20-25].

Additionally, Dr. Bouillion found it significant that the boys demonstrated regression from their previous level of development when they returned to Louisiana in December. [Tr. 81, lines 2-4; 92, lines 3-13]. He testified that A.J.M.D. continued to have problems with anxiety and stress. [Tr. 92, lines 9-10]. As to A.M.D., Dr.

---

[4]This was pursuant to an Order of the State court, before removal.

Bouillion reported that he had more serious problems of mood, anger and self-esteem. [Tr. 92, lines 10-11]. He also noted that the children had no meaningful contact with their mother since December. [Tr. 81, lines 4-6].

Few cases address the weight to be accorded to a psychologist's testimony in a Hague Convention case. In *Tahan v. Duquette*, 259 N.J.Super. 328, 333-335, 613 A.2d 486, 488-489 (N.J.Super.A.D.1992), the trial court was called to perform the grave risk analysis where a father had removed his nine-year-old child from its habitual residence in Canada. The father proffered a court-appointed clinical psychologist's psychological and bonding evaluation of the parties and the child, as well as testimony from his current wife and the child's teacher, regarding the psychological harm that the child would suffer if his life was disrupted by compelling his return to Canada. After the hearing, the trial court ruled that the Article 13b inquiry, concerning physical or psychological harm or otherwise placing the child in an intolerable situation, was not intended to cover factual matter which was subject to being considered in a plenary custody hearing. The trial judge opined that to do so would usurp jurisdictional prerogatives reserved by the Convention to the courts of Quebec. Accordingly, the court ruled that the proffered testimony would not be heard.

The Superior Court agreed, finding as follows:

> We agree with the trial judge that the Article 13b inquiry was not intended to deal with issues or factual questions which are appropriate for consideration in a plenary custody proceeding. Psychological profiles, detailed evaluations of parental fitness, evidence concerning lifestyle and the nature and quality of relationships all bear upon the ultimate issue. The Convention reserves these considerations to the appropriate tribunal in the place of habitual residence, here Canada, specifically Quebec. No court on a petition for return should intrude upon a foreign tribunal's subject matter jurisdiction by addressing such issues.

*Id*. at 334.

Here, the Court repeatedly informed the parties that its role was not to determine custody based on the best interest of the children. This inquiry is appropriate in a custody proceeding, not in a Hague Convention case. "It is settled law that the weight to be accorded expert opinion evidence is solely within the discretion of the judge sitting without a jury. While he may not arbitrarily fail to consider such testimony, he is not bound to accept it." *Pittman v. Gilmore*, 556 F.2d 1259, 1261 (5th Cir. 1977); *Webster v. Offshore Food Service, Inc.,* 434 F.2d 1191, 1193 (5th Cir. 1970).

In this case, the Court finds that John Dietz has failed to meet his burden of showing that returning the children to Mexico would expose them to a "grave risk".

The cases interpreting "grave risk" hold that more is required that just the normal consequences of taking a child from one parent and passing him to another. There has been no showing here that removing the boys from John Dietz and returning them to Anne Dietz would cause them imminent danger, serious abuse or neglect, or extraordinary emotional dependence. Rather, the adjustment problems exhibited by the children were of the type to be expected under the circumstances. Both boys have apparently re-adjusted. Additionally, the court finds that the actions of John Dietz, described below, (which were not disclosed to Dr. Bouillion) likely contributed to the adjustment problems of both children.

Accordingly, this argument lacks merit.[5]

## Age and Maturity

The Convention establishes that a court "may refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *England*, 234 F.3d at 271-272 (5th Cir. 2000) (*citing* Convention, art. 13, 51 Fed.Reg. at 10499)). The party opposing the child's return must establish the child's maturity by

---

[5]The testimony of the children's teachers and the school principal was to the effect that while the children had shown some regression immediately upon their return to Louisiana, both children had readjusted to school and their social lives within months of their return from Mexico, and were doing well at the time of trial.

a preponderance of the evidence. *Id.* (*citing* 42 U.S.C. § 11603(e)(2)(A) (1994). Like the grave risk exception, the "age and maturity" exception is to be applied narrowly. *Id*. (*citing* 42 U.S.C. § 11601(a)(4) (1994); *Nicholson v. Nicholson*, No. 97-1273-JTM, 1997 WL 446432, at *3 (D.Kan. July 7, 1997) ("The child objection defense has been narrowly construed"). "Whether a child is mature enough to have its views considered is a factual finding, and, as such, the district court is entitled to deference." *Simcox,* 511 F.3d at 604.

Additionally, the Court should distinguish between a child's objections, as defined in Article 13b, and a child's wishes, as expressed in a custody case:

> The Hague Convention also provides a limited
> opportunity for the child to be heard provided it has obtained an
> "age and degree of maturity" at which it is appropriate to take
> its views into account. But a main intention of this article was
> to draw a clear distinction between a child's objections, as
> defined in the article, and a child's wishes as commonly
> expressed in a custody case. This is logical, given that the
> Convention is not intended as an instrument to resolve custody
> disputes per se. It follows, therefore, that the notion of
> "objections" under Article 13b is far stronger and more
> restrictive than that of "wishes" in a custody case.

*Response to International Parental Kidnaping: Hearing Before the Sen. Comm. on Criminal Justice Oversight*, (1999) (statement of Catherine L. Meyer, British Embassy Co-chair of the International Centre for Missing & Exploited Children); 1999 WL 988418 (F.D.C.H.).

At trial, Dr. Bouillion testified that he had examined both children, as well as Anne Dietz, John Dietz, and John Dietz's present wife, Iniani Dietz. [Tr. 65, lines 17-20]. Dr. Bouillion stated that he had interviewed the boys on three separate occasions individually and apart from their parents. [Tr. 89, lines 13-15; 90, lines 5-7]. Based on his examinations, Dr. Bouillion opined that both boys could be interviewed and give a "fairly accurate description" of their thoughts and feelings. [Tr. 83, lines 20-22]. He further found that the children had the intellectual capacity and the judgment to do so. [Tr. 83, lines 22-23].

In making the determination as to whether the boys' objections should be considered, the court must consider the extent to which the "child[ren]'s views have been influenced by an abductor, or if the objection is simply that the child wishes to remain with the abductor." *Lieberman v. Tabachnik,* 2008 WL 1744353, *15 (D.Colo. Apr. 10, 2008) (*citing Nicholson*, 1997 WL 446432). Application of the defense is within the court's discretion if the court believes that the child's preference is the product of undue influence over the child. *Id; Hazbun Escaf v. Rodriguez,* 200 F.Supp.2d 603, 615 (E.D.Va.2002) ("[t]he discretionary aspect of this defense is important because of the potential for undue influence by the person who allegedly wrongfully retained the child"). If a court determines that the youngster's opinion is

the product of undue influence, the child's wishes are not taken into account." *de Silva v. Pitts,* 481 F.3d 1279, 1286 (10th Cir. 2007).

Here, evidence exists, and I find, that A.J.M.D.'s views were unduly influenced by his father. At trial, Anne Dietz testified that the first opportunity she had to see A.J.M.D. was when she picked him up at St. Peter's School in Louisiana in August of 2007. [Tr. 60, lines 5-9]. She stated that when A.J.M.D. saw her, he "started crying and trying to run away from me, and he started saying that this is all about money. Daddy's told me this is all about money and the house, and you want to take this all away from us and put us in foster care." [Tr. 60, lines 10-13].

Anne Dietz's testimony is corroborated by A.J.M.D., who testified that he did not think that his mother loved him, "[b]ecause she is just trying to use us to take money from us," and that she was "trying to take our house [in Mexico]." [Tr. 347, lines 11-18]. When the Court asked how he knew that his mother would do that, A.J.M.D. replied, "My dad was telling us, and he would show us some E-mails that Richard [Morrison] sent to him." [Tr. 347, line 25; 348, lines 1-2]. This testimony shows that A.J.M.D. was unduly influenced by his father.[6]

---

[6]Dr. Bouillion testified that he had no knowledge of this type of undue influence being used by John Dietz. This fact is another reason that the court declined to accept the expert testimony of Dr. Bouillion.

During the questioning of the children, the Court carefully examined the demeanor of the children, and finds that neither child was of sufficient maturity to take account of their views. The older child, A.M.D., age 13, presented with a flat affect and barely responded to questioning. His answers tended to be short and curt, and his manner on the witness stand was highly defensive. A.M.D. answered many questions with his eyes cast downward, in a voice best characterized as a low monotone. He was viably uncomfortable on the witness stand. *See Simcox*, 511 F.3d at 604 (court of appeals adopted lower court's finding that 8-year-old's views should not be considered because he was "preoccupied, disinterested and detached," avoided discussing his father, and was visibly uncomfortable in dealing with his memories from Mexico."); *England,* 234 F.3d at 272 (fact that 13-year-old child had maintained her friendships with children in America, preferred America to Australia, and currently enjoyed her situation which had stabilized, did not establish that she was mature enough for the court appropriately to consider her views on where she would prefer to live under the Hague Convention); *cf. McManus v McManus,* 354 F.Supp.2d 62, 71 (1st Cir. 2005) (objections of 14-year old children to their return to their habitual residence was honored where during their testimony, they appeared intelligent, mature and articulate, displayed appropriate understanding of, and

appreciation for, issues presented in the case, and effectively communicated their experiences and feelings concerning those issues.).

Given the evidence presented and my direct observations, I find that the children have not attained an age and maturity such that their views ought to be taken into account.

*One-Year/Well-Settled Defense*

The next defense is that plaintiff's petition was not timely filed because it was filed more than one year following the boys' removal from Mexico. *See* Convention, Art. 12; 42 U.S.C. § 11603(e)(2)(B); *Van Driessche,* 466 F.Supp.2d at 848; *Furnes v. Reeves,* 362 F.3d 702, 723 (11th Cir. 2004).

An application under the Hague Convention is not subject to a traditional statute of limitations period. *In re B. del C.S.B.,* 525 F.Supp.2d 1182, 1993 (C.D. Cal.2007). Instead, if the petition is filed with the district court over one year after the retention, it becomes subject to the "well-settled" defense. *Id.*; *See* Convention, art. 12; 42 U.S.C. § 11603(e)(2)(B). The well-settled defense prevents a child's return to his place of habitual residence when the child has become "connected to the new environment so that . . . return would be disruptive with likely harmful effects." *Id.* (*citing Zuker v. Andrews,* 2 F.Supp.2d 134, 141 (D. Mass.1998)). The well-settled defense provides that, if proceedings are commenced more than one year after

34

wrongful removal, the child should not be returned if he has become settled in, and accustomed to, his new surroundings. Hague Convention, art. 12. The well-settled defense must be proven by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B).

In determining whether the child is well-settled, courts consider the following factors: (1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly; (5) the stability of the mother's employment; and (6) whether the child has friends and relatives in the area. *Van Driessche*, 466 F.Supp.2d at 847-48; *In re Ahumada Cabrera v. Lozano*, 323 F.Supp.2d 1303, 1314 (S.D. Fla.2004).

Additionally, for the child to be well-settled, the court should consider more than whether he or she has a comfortable material existence, taking into consideration the child's living environment and any active measures taken to conceal a child. *Lops v. Lops*, 140 F.3d 927, 946 (11th Cir. 1998). Courts have also examined whether a parent who wrongfully removes a child will be prosecuted for concealment of the child. *Mendez Lynch v. Mendez Lynch*, 220 F.Supp.2d 1347, 1363-64 (M.D. Fla. 2002).

Here, the Court finds that both children are well-settled. The testimony of Dr. Bouillion, the children's teachers and pastors establishes that the boys are comfortable in their environment, get along well with their step-mother and step-

sister, attend school and church regularly, and participate in extracurricular activities such as soccer and scouting. [Tr. 68, line 20; Tr. 69, lines 15-16; 72, line 2; Tr. 81, lines 16-19; 85, lines 14-25; 86, lines 1-2; 221, lines 5-9; 226, lines 4-21; 227, lines 4-7; 351, lines 16-21; 353, lines 14-23; 376, lines 2-3, 7-9; 337, lines 13-24; 379, lines 13-17; 389, lines 19-21; 392, lines 18-20; 472, lines 5-10]. The parties do not dispute this issue.

Even if the Hague Petition was filed more than one year after the child was removed and the child is well-settled, the court should determine whether equitable justifications exist for tolling the one-year period. The purpose of equitable tolling is to ensure that a parent who takes intentional and significant steps to conceal his or her children for more than one year will not be rewarded for that misconduct by creating eligibility for an affirmative defense not otherwise applicable. *Furnes*, 362 F.3d at 723. When the abducting parent has concealed the child, the one-year limitation period has been tolled until the parent seeking the child has located him or her." *Van Driessche*, 466 F.Supp.2d at 852; *Furnes*, 362 F.3d at 724 (tolling the limitation period four to six months due to respondent's concealment of the child and petitioner's extensive efforts to locate them); *Lops*, 140 F.3d at 933, 946 (finding that respondent and his mother took significant measures to conceal the child, including purchasing a home but keeping it in the seller's name, transacting business only in

cash, refraining from taking a job that required disclosing a social security number, not paying taxes, not obtaining a driver's license, and essentially avoiding any electronic identity); *Lynch*, 220 F.Supp.2d at 1363 (tolling limitations period six to nine months because respondent concealed the child by living with friends of others or in public abuse shelters, telling her husband she was on vacation but would return, threatening to go underground with the children or take radical steps to change her identity, using a commercial post office box, and numerous other steps to conceal her location); *Belay v. Getachew*, 272 F.Supp.2d 553, 565 (D. Md. 2003) (tolling limitations period until petitioner, through his own efforts, independently discovered child's location and acted with due haste in bringing the petition once he knew it); *In re Ahumada Cabrera*, 323 F.Supp.2d at 1309 (tolling limitations period because respondent promised to come back at a future date, threatened to "get lost" if petitioner insisted the child be returned, and threatened to deprive petitioner of all communications with his daughter if he initiated proceedings against them through the Central Authority).

In *Van Driessche*, 466 F.Supp.2d at 853 (*citing Furnes* and *Belay*), the court looked to "facts taken together" to determine that the petitioner had enough evidence to suggest that his child was in Houston and no evidence that the child could be anywhere else. *Id.* at 853. The court concluded that the one-year period should be

tolled until the date that the Belgian government sent a letter to the Southern District of Texas seeking information in Houston concerning the mother's whereabouts. It noted that the petitioner could have had the government act on his behalf and concurrently filed a Hague Petition, based on the same information in the letter. *Id.* at 854. "Even if an abducting parent does not provide an address or phone number to the seeking parent, a petitioner can file a petition with the Central Authority to implement a Hague Convention proceeding." *Id.* at 852-853 (*citing Lynch*, 220 F.Supp.2d at 1354. Therefore, it is not necessary for the petitioner to know the exact location or address, or phone number to file a petition under the Hague Convention.

In *Belay*, the petitioner came to the United States to see his child, but was picked up and taken to an unknown residence and able to see his child for 15 minutes, never learning where his child was located. The court determined that this meeting was not sufficient to end the tolling period, as the period was extended to when the National Center for Missing and Exploited Children informed petitioner of the location of his child. It held that the equitable estoppel period (used interchangeably with equitable tolling) lasted until "the Petitioner, through his own efforts, independently discovered [his child's] location." *Id.* at 565.

In determining the application of equitable tolling, a petitioner's efforts to seek the child's return are also considered. *Furnes*, 362 F.3d at 708-09 (applying tolling

after the father began ceaseless efforts to locate his child and her mother by contacting the landlord of the mother's home, contacting the local post office to find a forwarding address, contacting her relatives both at home and work, begging them to reveal her whereabouts, and traveling to Florida and Georgia in the United States after having been informed that they might be living there); *Lynch*, 220 F.Supp.2d at 1352-53 (applying tolling after the father sought his child's location by "bombarding" his friends and acquaintances with calls, contacting the International Police (Interpol), and calling every Vazquez in Miami, Florida trying to locate them); *cf. Wojcik v. Wojcik*, 959 F.Supp. 413, 420-21 (E.D. Mich.1997) (finding no reason to apply equitable tolling because the mother did not hide the children, and the father did not take any actions to seek their return other than filing for divorce).

Courts also look at possible criminal proceedings and their potential effect on the child in determining a tolling of the one-year limitation period. *Lynch*, 220 F.Supp.2d at 1363-64 (noting there was little likelihood the respondent would be prosecuted for concealment because petitioner had promised to dismiss any criminal proceedings and believed the children needed their mother); *In re Ahumada Cabrera*, 323 F.Supp.2d 1303,1314 (S.D. Fla. 2004) (*citing Lops*, 140 F.3d at 946, for the proposition that courts should consider the possibility of prosecution for conduct concealing the child). In this case, the record reflects that an outstanding arrest

warrant for John Dietz's taking of A.J.M.D. out of the country is pending in Mexico. [Plaintiff's Trial Exhibit 3; Tr. 46, lines 2-4; 288, lines 1-4; 292, lines 8-17].

Here, the record shows that as soon as Anne Dietz found out from the school that A.J.M.D. had been removed permanently, she called the home of John Dietz's parents, who lived in Gueydan, Louisiana, to discover the whereabouts of her ex-husband. [Tr. 34, lines 22-23]. She spoke to John Dietz's brother, Thomas, who told Anne Dietz that they might be at Six Flags, but he did not really know where they were. [Tr. 34, lines 24-25; 38, lines 4-9; 152, lines 4-11; 153; lines 1-4]. She said that she kept calling John Dietz's parents to ascertain the location of the children, because John Dietz was not answering his cell phone. [Tr. 37, lines 18-24]. However, once his parents answered one of her phone calls, John Dietz's mother told Anne that "John does not want us to talk to you." [rec. doc. 37, line 25; 38, lines 2-3; 181, line 25; 182, line 1].

Anne Dietz further testified that she had called Louisiana first, because John Dietz's parents lived there. [Tr. 41, lines 13-15]. However, because John Dietz performed legal work on Indian reservations, and was licensed to practice law in Colorado and New Mexico, she also thought that he could have taken the children to New Mexico, Colorado, or Arizona. [Tr. 41, lines 13-16; 301, lines 4-7]. John Dietz, along with his sons, also owned an interest in 42 acres of land in Colorado . [Tr. 259,

lines19-23; 260, lines 3-6]. Anne Dietz testified that she did not know that John Dietz and the children were back in Louisiana until August of 2006. [Tr. 41, lines 19-21; 152, lines 10-11].

Anne Dietz stated that her first telephone conversation with her sons after A.J.M.D. was taken on May 19, 2006, was in August, 2006. [Tr. 56, lines 1-6]. She testified that John Dietz called her and asked if she wanted to talk to her sons, to which she responded, "Of course." [Tr. 56, lines 7-9]. John Dietz did not have a regular phone line in Gueydan, so he called Anne Dietz from a Vonage line to speak to her sons. [Plaintiff's Exhibit 6; Tr. 300, lines 9-20]. Anne Dietz believed that all of her conversations with the boys were on a speaker phone. [Tr. 56, lines 17-19; 57, lines 19-23].

The record reflects, and I find as fact, that Anne Dietz did not know where her children were until August, 2006. Although she made efforts to find them by telephoning John Dietz and his parents, she was prohibited by John Dietz from speaking with them until August, 2006. The Court finds that the one-year period was tolled until August 2006, and that, therefore, this was the date that the one-year period began to run in this case. Since the petition was filed in state court on July 13, 2007, the

petition was timely filed within one year of the date that Anne Dietz located the children, and, thus, the "well-settled" defense is not available to John Dietz here.[7]

## *CONCLUSION*

Based on the foregoing reasons, the Court will render judgment in favor of the plaintiff, Anne Dietz. The children must be returned forthwith to Mexico.

ICARA provides that the court "shall order the [removing parent] to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees . . . and transportation costs related to the return of the child, unless the [removing parent] establishes that such order would be clearly inappropriate". 42 U.S.C. § 11607(b)(3). John Dietz has made no such showing here. Accordingly, the court will also enter judgment in favor of Anne Dietz and against John Dietz , for all reasonable attorney fees and costs incurred by Anne Dietz in these, and the state court proceedings, as well as the reasonable travel cost of Anne Dietz and the children. *Sealed Appellant*, 394 F.3d at 346 (*citing* Convention, art. 26; Explanatory Report, ¶ 136, at 468.

Counsel for Anne Dietz is to file an affidavit, itemizing by date and description, the time expended in this case, his customary hourly rate, the customary hourly rate for

---

[7]It should also be remembered that Anne Dietz had filed an application for return of the children on May 24, 2007 with the Central Authority.

any legal assistant or other lawyer employed on this case, and his costs and expenses incurred in the prosecution of this case, within thirty (30) days of the date of the signing of these Reasons. The court will thereafter enter an additional Order, setting the fees and expenses awarded.

September 17, 2008, Lafayette, Louisiana.


C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE